# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

JAE HYUN PARK,                          )
                                        )
      Plaintiff,                 )
                                        )    CASE NO.
v.                                      )
                                        )    2:23-CV-0069
E-TRADE FINANCIAL                       )
CORPORATE SERVICES, INC.                )
E-TRADE SECURITIES, LLC,                )
FINANCIAL INDUSTRY                      )
REGULATORY AUTHORITY, INC.              )
                                        )
      Defendants.               )
_____)

FILED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

MAY 02 2023

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

## PLAINTIFF'S AMENDED COMPLAINT

COMES NOW, JAE HYUN PARK ("Plaintiff") in the above styled action, and respectfully requests the Court to allow Plaintiff to amend his complaint pursuant to GA. CODE ANN. § 9-11-15 (2010) and FED. R. CIV. P. 15(a)(1). Plaintiff filed the original complaint with this court on April 17, 2023. Plaintiff is filing this amended complaint as a matter of right before the entry of a pretrial order. Plaintiff shows the court as follows:

### PARTIES

1.     Plaintiff is a resident of Georgia and the owner of Meta Materials

Torchlight Preferred Shares ("MMTLP") associated with Meta Materials, Inc.

("Meta"), a Canadian corporation listed in the American over-the-counter ("OTC")

market and is traded publicly.

2.     MMTLP shares were offered by E-Trade Corporate Services, Inc. and

E-Trade Securities, LLC (collectively referred to as "E-Trade" or "Defendant"),

which provides institutional brokerage services including stocks and shares in the

OTC market.

3.     On or around November 15, 2022, Plaintiff purchased MMTLP shares

from E-Trade using Defendant's online platform, and continued to buy them

throughout early December 2022.

4.     Financial Industry Regulatory Authority, Inc. (referred to as "FINRA"

or "Defendant") is a private, non-profit self-regulatory organization ("SRO"),

under the supervision of the U.S. Securities and Exchange Commission ("SEC"),

and conducts day-to-day regulation of the national securities markets pursuant to

the legal authority delegated to it by Congress. FINRA does not directly sell or

offer securities to the public, but rather, regulates broker-dealers such as E-Trade

and oversees the national securities market such as NASDAQ, New York Stock

Exchange, and also oversees the OTC market to ensure compliance with FINRA's rules, federal securities laws, and all relevant rules and regulations.

## JURISDICTION AND VENUE

5.     The federal judicial district identified in this Complaint has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity jurisdiction. Defendant FINRA is a Washington D.C. citizen. Defendant E-Trade is a Virginia citizen. The amount in controversy exceeds $75,000.

6.     The federal judicial district identified in this Complaint has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 based on issue arising out of federal law.

7.     FINRA maintain sufficient contacts with the State of Georgia by regulating investors within the state. Defendant has a physical office in 303 Perimeter Center North, Suite 550, Atlanta, GA 30346.

8.     E-Trade maintains sufficient contacts with the State of Georgia by offering its platform to residents of Georgia. Defendant has a physical office in 5565 Glenridge Connector, Suite 1900, Atlanta, GA 30342.

## INTRODUCTION

9.      Back in June 28, 2021, a company named Torchlight Energy

Resources, Inc. ("Torchlight"), which was an oil and gas exploration company,

merged with Meta and ceased to exist[1]. Although Meta has its own shares called

MMAT stock ("MMAT") that is still publicly traded as of today, MMTLP was

provided by Torchlight to its investors as a placeholder for a dividend, and issued

to Torchlight holders MMTLP, which are Preferred Share Dividend, and was never

intended to have been traded on the open market. Regardless of intention, MMTLP

was traded on the open market and offered by broker dealers such as E-Trade and

many others for available to purchase in the U.S. market.

10.     On November 23, 2022, Meta Materials announced its board had

approved the corporate action to issue distribution to MMTLP shareholders 100%

common stock of its subsidiary, a private company named NextBridge

Hydrocarbons ("NextBridge"), and shareholders of MMTLP would receive

NextBridge shares on a 1:1 ratio.[2] Additionally, it was planned for MMTLP to be

deleted and spun out as it transitioned to NextBridge, according to the S-1. A total

---

[1] See SEC.gov archive:
https://www.sec.gov/Archives/edgar/data/1431959/000119312521203407/d189140dex991.htm#:~:text=Comme
ncing%20on%20June%2028%2C%202021,the%20ticker%20symbol%20%E2%80%9CMMAT.%E2%80%9D

[2] See Meta Materials Press Release: https://metamaterial.com/meta-materials-inc-board-of-directors-approves-
planned-completion-of-the-spin-off-of-next-bridge-hydrocarbons-inc/

of 165,523,363 MMTLP shares were officially recognized to exist in the market according to registration statement S-1 form filed with the SEC[3]. On December 6, 2022, FINRA issued a Corporate Action[4] stating that shareholders had until December 12, 2022 to settle their MMTLP positions, and December 13, 2022 is the date that MMTLP will be cancelled.[5] This was posted in FINRA Daily List publication on its own website, which is a Company-Related Action that facilitates the orderly trading and settlement of OTC Equity Securities.

11.    On December 8, 2022, FINRA revised the same notice to say that MMTLP will be deleted (instead of cancelled) on December 13, 2022. Either way, many investors, including Plaintiff, relied on this notice to believe that there was time to sell or trade MMTLP before the 13th of December.

12.    However, without any prior notice or warning, FINRA issued a U3 halt on the morning of December 9, 2022.[6] The notice for the halt mentioned

---

[3] See SEC.gov S-1 Statement:
https://www.sec.gov/Archives/edgar/data/1936756/000119312522257967/d302576ds1a.htm

[4] Federal securities regulations task FINRA with processing corporate action announcement requests by companies that trade in the over-the-counter (OTC) marketplace rather than on a national securities exchange:
https://www.finra.org/investors/insights/corporate-actions-public-companies-what-you-should-know

[5] See Exhibit B: FINRA's Daily List Notice

[6] See Exhibit E: FINRA Halt Notice: (U-3 Halt has been issued a total of 344 times since 2014, and only 3 times ever on domestic stocks).

extraordinary event has occurred, but did not go into a specific reason or detail as to what this extraordinary event was. In the same notice, it mentioned that the halt would continue until the symbol was deleted on December 13, 2022.

13.    As of April 17, 2023, the halt still exists to this day, which has been more than four months. MMTLP still has not been deleted[7], and to Plaintiff's knowledge, shareholders have not received a single share of actual NextBridge shares. Instead, Plaintiff and other shareholders received a placeholder CUSIP of random numbers, valued at 0, that is still reflected in Plaintiff's account today. These CUSIP placeholders vary from brokerages to other brokerages and hold no actual value, and does not represent shares in an actual company. The MMTLP shares that Plaintiff held were effectively replaced with these worthless assets against the will of Plaintiff and other shareholders.

14.    Plaintiff also believes that there were excessive short positions for MMTLP that Defendants acted in collusion to prevent the reconciliation of those positions held by Market Makers and Brokerages at the expense of the shareholders. It is common knowledge that all short positions must be closed when

---

[7] The ticker symbol was deleted and backdated, but Plaintiff believes MMTLP is still within the systems of Defendants.

a public company spins off into a private one. On December 8th, the final trading day before trading was paused by FINRA, MMTLP dropped in value from $10 to $2.90, which is an extreme price drop and sale volume. However, Fidelity's retail report showed that approximately 90% of its retail users were purchasing MMTLP rather than selling it on the last two trading days.[8] This implied that while retail investors were busy buying, systematic short selling was happening.

15.    Data reports from FINRA's own website shows that this last day had approximately 9.5 million in short volume in a day that had 13,693,421 total volume.[9] Although it is difficult to ascertain the exact short interest using only public information, the sheer number of short volume versus total volume in the last fourteen (14) trading days of MMTLP is simply staggering[10]. The daily short volume data excludes any trading activity that is not publicly disseminated[11]. This number only includes reported short volume and would likely not include naked

---

[8] *See* Fidelity Report: Exhibit I

[9] *See* FINRA Short Sale Volume Data: Exhibit J

[10] *See* Exhibit K

[11] *See* FINRA - Investor Insight: https://www.finra.org/investors/insights/short-interest

short activity, which Plaintiff believes that this would bring the actual number much higher.

16.    In fact, on February 6, 2023, the CEO of OTC Markets, Cromwell Coulson, tweeted from his verified account (which now deleted) that "There was a short position in $MMTLP," and confirmed that short position holders were effectively stuck because these positions were never closed, and suggested that NextBridge shares should become publicly tradeable in order to resolve this dilemma.[12] This effectively implied that Market Makers, and bad faith actors in collaboration with broker dealers, have an incentive to conclude this matter by pushing a private company to go public in order to resume trading, but by promoting 'public trading' rather than settling unresolved short & long positions, would like another opportunity to short this security into the ground and absolve themselves of any responsibilities to settle millions of open short positions at the expense of shareholders. Plaintiff believes that the exact number of open short positions on MMTLP will be easily confirmed with a court-ordered discovery request on Defendants.

---

[12] See Exhibit A, also see https://twitter.com/cromwellc/status/1622648343275896847; http://twitter.com/cromwellc/status/1622648357561696260;

17.     On December 7, 2022, Jeff Mendl, vice president of OTC markets,

publicly stated that MMTLP trading will happen for December 9 and December

12, 2022 through a media interview hosted by Trader TV. Everyone expected there

to be last two days of trading, but it was abruptly halted, without warning, by

FINRA, and E-Trade was complicit in complying with such reckless action.

18.     Dave Lauer, current FINRA Market Regulation Committee member,

publicly stated on social media with his verified account that (in reference to

MMTLP) "I think that FINRA has really screwed up this entire situation, and the

lack of transparency has been egregious. This is not ok...they need to explain

exactly what happened & what the full share count or audit shows, even if under

investigation. If the books are reconciled, that needs to be shown – if they're not,

then it needs to happen."

19.     Under the original plan, MMTLP was meant to dissolve into

NextBridge, and any shareholders of MMTLP were supposed to receive one (1)

NextBridge share for every one (1) MMTLP share that they held, and MMTLP

was supposed to be deleted. FINRA issued MMTLP a "D1" issuance to delete the

symbol after two months, and backdated to December 13, 2022 even though the

actual ticker deletion happened on February 16, 2023.[13] In fact, FINRA blames the

delay of the official deletion of the ticker symbol on a "coding issue," but does not

explain what this specific technical issue is, nor does it explain how it could only

miraculously happen to MMTLP's ticker symbol and not any of the thousands of

others.[14] Additionally, Plaintiff alleges that although the ticker symbol is deleted,

he believes that this is a just a façade and Defendant holds the ability to revert the

ticker symbol deletion because MMTLP still is not truly deleted.

20.    In reality, MMTLP cannot be deleted because there are still open short

positions, and a private company cannot carry open positions from a public market.

As to why these short positions are not able to be reconciled is a question for the

Honorable Court to ask if it chooses to do so, because it is the Defendants'

responsibility to reconcile, and have access to detailed nonpublic information that

Plaintiff and the other shareholders do not. Plaintiff firmly believes that MMTLP

short positions are not reconciled because it is ***unable*** to do so, due to the fact that

there are more short positions open than there are existing shares available on the

---

[13] https://finra.org/sites/default/files/OTCE_Daily_List_User_Guide.pdf  Page 11 code definition D1 – Security deleted from OTCE

[14] *See* Finra FAQ: https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt#:~:text=FINRA's%20corporate%20action%20notice%20also,14%2C%202022%2C%20distribution%20date%20of

market. Additionally, Plaintiff believes that Defendants are not willing to reconcile the short positions because they will have to buy back the shares from a group of frustrated retail shareholders who are quoting prices such as several thousand dollars per share on social media platforms, costing broker dealers such as E-Trade and bad faith actors with short positions millions, if not hundreds of millions of dollars, to close out all existing short positions.

21.    To Plaintiff's knowledge, none of the MMTLP shareholders have yet to receive a *legitimate* NextBridge share to this day[15], one hundred plus days plus after FINRA issued a U-3 halt, because MMTLP has not been effectively closed out. It is of Plaintiff's opinion that retail investors, including Plaintiff, should not be paying for the mistakes and greed of Market Makers and bad faith actors who participated in institutional shorting of MMTLP with the aid of Defendants. To add insult to injury, Defendants terminated Plaintiff's right to decide if whether he wanted to go into NextBridge shares or to sell MMTLP without his consent.

22.    Naked short selling is a practice of selling short a stock or other tradeable security without first borrowing the shares to sell, or arranging to borrow

---

[15] Plaintiff strongly believes that any and all Nextbridge Hydrocarbon share issued to a select few shareholders are not legitimate shares backed by an actual paper certificate

them. It is an illegal practice prohibited and enforced by the SEC. Therefore, when

a naked short sale happens, someone is selling something that they don't have by

means of an illegal act. When there is a "failure to deliver" ("FTD") to the buyer,

which is governed by FINRA Rule 4320,[16] it is implied that there is naked shorting

taking place, although it does not necessarily have to be the case. Under this rule, if

the market participant of the clearing agency fails to close out the position within

13 consecutive settlement days, the market participant needs to close out the

position by purchasing the shares that were shorted, or securities of like kind and

quantity. FINRA's own website showed that MMTLP was on its list for 41

consecutive days.[17] On SEC's database, MMTLP had 215,238 FTDs as well as

Meta's MMAT stock having over 3 million FTDs.[18] Because this information is

very difficult to access for the public, Defendants will be able to verify more

---

[16] See FINRA Rule 4320: https://www.finra.org/rules-guidance/rulebooks/finra-
rules/4320#:~:text=(a)%20If%20a%20participant%20of,securities%20of%20like%20kind%20and

[17] *See* Exhibit C, also see FINRA OTC Threshold Securities List, search date range 10/14/2022 – 12/12/2022:
https://otce.finra.org/otce/otcThreshold; FINRA claims, in its FAQ: MMTLP Corporate Action and Trading Halt, that
MMTLP was not supposed to be on its Threshold Securities List but was on it due to a unspecified and vague
"Coding Issue." However, the duration of time MMTLP was on the Thresholds Securities List leads one to believe
that this was not a Coding Issue. https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-
trading-
halt#:~:text=FINRA's%20corporate%20action%20notice%20also,14%2C%202022%2C%20distribution%20date%20o
f

[18] *See* Exhibit D.

details through discovery. Plaintiff believes that that there was naked short selling

taking place that artificially depressed the price of MMTLP, especially on

December 8, 2022. Because Defendants are not willing to disclose any of this

information, Plaintiff requests for transparency through court-ordered action.

23.    Plaintiff alleges that Defendants allowed MMTLP to be shorted for

their own benefit and profits. FINRA, as a regulatory body, and broker dealers,

such as E-Trade, has had a history of incestuous relationship where one employee

often leaves employment from one to the other. This is alarming because one is in

the role of overseeing the other, but personal connections and job history

intertwined creates a legitimate conflict of interest. In this respect, Plaintiff

believes that FINRA was incentivized to carry out the U-3 halt on December 9,

2022, to aid Defendant and other bad faith actors in order to short MMTLP to the

ground without worrying about closing the short positions, at the very expense of

shareholders such as Plaintiff, and thereby violating securities law.

24.    E-Trade, as the broker dealer, marked and represented to Plaintiff that

it was selling legitimate and authentic shares of MMTLP. Not only did Defendant

have knowledge that naked shorting was taking place, Defendant also aided in

selling counterfeit shares to many investors, and allowed its platform to be utilized

for naked short selling. Defendant lent out MMTLP shares belonging to many

investors, including Plaintiff's, without consent, which was then used to create

further short positions to further lower prices to assist the bad faith actors who

were actively naked shorting MMTLP. Back in December 2022, when Plaintiff had

no knowledge that this was happening, Plaintiff relied on Defendant's false

representation to purchase MMTLP on multiple occasions. Defendant acted in a

manner that was directly harmful to the interests of its retail clients, such as

Plaintiff, by halting trade abruptly, meanwhile allowing covert market activity to

take place directly on its platform. Even if Defendant denies having knowledge of

these claims, E-Trade, with its massive presence and significant years in business,

should have known that its actions would directly harm its retail investors.

25.     It is estimated that there are around 64,000 MMTLP investors[19], many

of whom are your average middle-class Americans, including Plaintiff, that have

been severely harmed by this MMTLP fiasco, and Plaintiff implores this

Honorable Court for immediate relief.

26.     There has been inquiries for answers and transparency by Congress to

Defendant regarding MMTLP, as evidenced by official letter.[20]

---

[19] This number was derived from NextBridge Hydrocarbon's Prospectus filed with the SEC:
https://www.sec.gov/Archives/edgar/data/1936756/000119312522292114/d302576d424b4.htm

[20] *See* Exhibit H

27.     To this day, Defendants have not explained (1) what the

"extraordinary event" is, that FINRA posted at its Halt Notice Announcement; (2)

why Plaintiff and almost every MMTLP shareholder still has a random CUSIP

placeholder instead of authentic NextBridge shares four months after the spin-off;

(3) the existing short positions that are still not reconciled and what the Defendants

will do to reconcile them; or (4) any resolution or any communication to MMTLP

shareholders who are currently frozen out of their shares and money.

28.     Plaintiff claims he is entitled to legal fees and expenses and requests

that the Court order the same. Due to the severity of the issue at hand, and

malicious nature of the acts by the Defendants, Plaintiff is entitled to an award of

punitive damages. In addition, Plaintiff asks for monetary damages from

Defendant E-Trade, while asking for an injunction from Defendant FINRA to

return to shareholders the two full trading days that were taken away, under the

condition that all open short and long positions to be closed and reconciled upon

doing so. Although Defendants may argue otherwise, Defendants have the ability

in their respective systems to reinstate MMTLP by removing the random CUSIP

identification numbers. The reinstatement of two full trading days for MMTLP

without trading restrictions, where the numerous short positions would be forced to

close, would bring immediate relief to Plaintiff and justice for all MMTLP

shareholders. In addition, Plaintiff requests that Court order Defendants an

accounting of all actual, short sale, borrowed, loaned and any and all forms of

MMTLP shares, as well as all existing open positions that have not been

reconciled.

## CAUSES OF ACTION

### (a). VIOLATIONS OF SECTION 10(b) AND 10(b)-5 OF THE SECURITIES EXCHANGE ACT

29.    Plaintiff hereby incorporates and re-alleges paragraph 1-28 as if fully

set forth herein.

30.    Section 10(b) of the Securities Exchange Act of 1934 ("Exchange

Act") prohibits "to engage in any act, practice, or course of business which

operates or would operate as fraud or deceit upon any person." *See* 17 C.F.R. §

240.10b-5. Defendants allowed investors to believe that trading would continue

until end of day December 12, 2022, but pulled the plug on trading two days before

this date via the U-3 halt. This is contrary to the prospectus that was approved by

the SEC.

31.    To establish liability under Section 10(b), the following points must

be proven: (a) the Defendant made a material misstatement or omission; (b) the

misstatement or omission was made with an intent to deceive, manipulate, or

defraud; (c) there is connection between the misrepresentation or omission and the

Plaintiff's purchase or sale of a security; (d) the Plaintiff relied on the misstatement

or omission; (e) the Plaintiff suffered economic loss; and (f) there is a casual

connection between the material misrepresentation or omission and the Plaintiff's

loss. *See* Dura Pharms, Inc. v. Broudo, 544 U.S. 336, 341-42 (2005).

32.    FINRA made a material misstatement when it released the December

6, 2022 Daily Notice regarding MMTLP's final trading date. E-Trade made a

material omission when it did not alert its clients, including Plaintiff, that contrary

to the December 6, 2022 Daily Notice, it had plans to halt trading on December 9

by accepting FINRA's request. In fact, U.S. Supreme Court has explained that, as a

broker who has a fiduciary duty to its clients, "silence in connection with the

purchase or sale of securities may operate as a fraud actionable under 10(b) when

there is a duty to disclose arising from a relationship of trust and confidence

between parties to a transaction." *See* Chiarella v. United States, 445 U.S. 222, 230

(1980); *see also* SEC v. Zandford, 535 U.S. 813, 823 (2002).

33.    The misstatement and omission were made from Defendants with an

intent to defraud MMTLP shareholders. Many shareholders, who were nervous

about holding the security till its last closing day before spin-off felt relieved that

there was finally some communication, direction, and guidance from an official

source. To evidence this, price of MMTLP almost doubled immediately from

$5.04 to $9.50 within the same day following the immediate news. By entrapping

more shareholders and retail investors and shorting the security at a higher price,

Defendants stood to gain whether from its own financial profits or from actively

assisting the bad faith actors who were shorting this security. Defendant basically

argues that the reason for its halt was its *concern* for buyers purchasing MMTLP

without buyers realizing that it needed T+2 to clear, and buyers would not receive

MMTLP shares before they were cancelled, nor would they be recorded to be

eligible to receive NextBridge shares.[21] However, Defendant's words are

contradictory to Defendant's actions. Defendant's decision to wait until December

9th to halt trading, without notice and contradicting its December 6th

announcement, rather than issuing a corporate action announcement or providing

an advanced notice that it will halt trading, shows Defendant's wanton disregard, at

best, or fraudulent at worst, for both buyers and existing shareholders because

Defendant effectively trapped everyone, and MMTLP investors' money is now

frozen in limbo. Additionally, instead of halting the trade and screwing over

---

[21] FINRA issued a statement saying that they issued a U-3 halt because they needed time to clear the trades for settlement T+2, see https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt

everyone in the process, Defendants could've issued a disclaimer or warning

message when purchasing the share to warn purchasers that there was imminent

likelihood that there would be clearing issues. Defendants also could've had a

"close only" market as an alternative but chose not to do so, when many other

Broker-dealers were getting ready to do so.[22]

34.    FINRA's justification on why they had to halt the trading two days in

advance is a complete fabrication,[23] because (a) Defendant had numerous months

in advance to know, or should have known, that MMTLP will cease to trade in the

open market; and (b) Defendant's U-3 halt, which was extraordinarily rare in

nature, was not utilized for other domestic stocks that also spun off into a private

stock; and (c) the convenient "coding issue" cited by Defendant for their system

strangely has no other stocks that it affected except solely for MMTLP exactly at

this specific interval of timing. By acting against its own previous announcement,

Defendant actively defrauded MMTLP shareholders who were waiting till the last

hours of market activity to wait for the short squeeze.

---

[22] *See* Exhibit G

[23] *See* FINRA FAQ, *supra*

35.   This Court has stated that severe recklessness satisfies the scienter requirement. <u>McDonald v. Alan Bush Brokerage Co.</u>, 863 F.2d 809, 814 (11th Cir 1989) (citing <u>Woods v. Barnett Bank of Fort Lauderdale</u>, 765 F.2d 1004, 1010 (11th Cir. 1985)). It went out to explain, "Severe reckless is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Defendant must have known that, its announcement on December 6 specifying that last date of trading would be December 12 would likely mislead buyers and current shareholders into believing December 12 would be the last date to sell.

36.   Plaintiff purchased more MMTLP after December 8's notice, which shows Plaintiff relied on the misstatement and omission. In fact, Plaintiff alleges that he would have sold the security earlier, due to uncertainty, if such notice was not put out.

37.    Plaintiff suffered actual economic loss, even if speculation is ignored

that this security could have fetched extremely high prices via 'short squeeze.'[24]

38.    There is obvious and undoubted connection between the material

misrepresentation or omission and Plaintiff's loss.

### (b). PRELIMINARY INJUNCTION

39.    Plaintiff hereby incorporates and re-alleges paragraphs 1-38 as if fully

set forth herein.

40.    "Universal test of jurisdiction to issue injunctions is absence of legal

remedy by which the complainant might obtain the full relief to which the facts

and circumstances entitle the complainant" Chadwick v. Dolinoff, 207 Ga. 702

(1951). Without a court-ordered injunction, Plaintiff alleges that he has no

authority to obtain relief from a SRO such as Defendant due to the legal constraints

that are designed in place to protect SROs from private suits.

41.    Plaintiff is aware that Injunction is not a proper remedy against

completed acts, See Sandt v. Mason, 208 Ga. 541 (1951), however, Plaintiff fully

believes that seeing how an overwhelming majority of MMTLP shareholders,

---

[24] Short squeeze, is defined as "a situation in which the price of a stock rises to such an extent that investors who have sold short purchase the stock in order to limit their losses, causing the price to rise further." Source: Oxford Languages

including Plaintiff, are held in limbo, without access to their funds and without

having received a proper NextBridge share, that there has been no completion.

42.    Plaintiff's burden for establishing the right to preliminary injunctive

relief are: (a) the likelihood of irreparable harm; (b) the substantial likelihood of

success on the merits; (c) the balance of equities tips in his favor; and (d) that an

injunction is in the public interest. *See* Winter v. Nat Res. Def. Council, Inc., 555

U.S. 7, 20 (2008).

43.    Plaintiff has likelihood of irreparable harm because, MMTLP has

been halted trading with no resolution, and Plaintiff has completely lost out all

monies invested in MMTLP due to this halt. Plaintiff and other investors have not

been given NextBridge shares and are simply held in limbo, after more than 100

days since the halt on December 9, 2022. Plaintiff and others have been robbed of

their two full trading days, which likely would have resulted in a short squeeze,

and were robbed of their rights to whether to even choose to move to NextBridge.

44.    Plaintiff has a substantial likelihood of success on the merits because

there are obvious damages that can easily be seen as directly stemming from

Defendants actions, and the type of behavior demonstrated from Defendants is

illegal in nature. Not only do Defendants show bad faith behavior, but there is

ample evidence referenced in this Complaint to show a higher bar that Defendants'

actions were intentional rather than reckless.

45.    In assessment of balancing the equities, Plaintiff believes that he will

suffer harm if this injunction is not issued against FINRA. Courts generally hold

that the party being enjoined do not suffer harm from being forced to stop

engaging in illegal conduct, to which Plaintiff alleges that Defendants have and are

continuing to engage.

46.    There is strong public interest for issuing this injunction, not only

among MMTLP shareholders who have lost their livelihoods and financial savings

through Defendants' misconduct, but also for the integrity of the entire U.S. stock

market. Once the public realizes that an SRO is protecting bad faith actors who are

utilizing counterfeit shares to actively short stocks, and no injunction or legal

remedy can reach them, then the trust and people's willingness to participate in the

U.S. stock market will be broken and it will result in long-term consequences.

State of Georgia also has an interest in transparency of private corporations and

SROs, and has an interest to protect retail investors from fraudulent behavior of

broker dealers and SROs.

### (c). FRAUD

47.    Plaintiff hereby incorporates and re-alleges paragraphs 1-46 as if fully

set forth herein.

48.    Under Georgia law, Plaintiff alleges that Defendants were engaged in

fraud. *See* GA Code § 23-2-51 (2020).

49.    Any misrepresentation intended to deceive and which does deceive is

a fraud, for which a party is entitled to a remedy at law. *See* <u>Oliver v. O'Kelley</u>, 48

Ga. App 762 (1934).

50.    The five elements of fraud and deceit in Georgia are: (1) false

representation made by the Defendant; (2) scienter; (3) an intention to induce the

Plaintiff to act or refrain from acting in reliance by the Plaintiff; (4) justifiable

reliance by the Plaintiff; (5) damage to the Plaintiff. *See* <u>Eastern Motors Co. v.

Lavender</u>, 69 Ga. App. 48 (Ga. Ct. App. 1943).

51.    To allege fraud, the claimant must content the Defendant knowingly

made a false representation with the intent and purpose of deceiving the Plaintiff.

Additionally, there must be a reliance on such representations and a loss sustained

thereby. *See* <u>Cone Mills Corp. v. A.G. Estes, Inc.</u>, 377 F.Supp. 222 (N.D. Ga.

1974).

52.    Plaintiff predicts that Defendant FINRA will argue that its SRO status

will provide quasi-governmental immunity to the claims in this Complaint from the

Exchange Act. Federal courts have long recognized the doctrine of absolute immunity when a national securities association or SROs is acting within its regulatory capacity. *See* <u>Sparta Surgical Corp v. NASD, Inc.,</u> 159 F.3d 1209 (9th Cir. 1998); *see also* <u>D'Alessio v. NYSE, Inc.,</u> 258 F.3d 93, 104 (2nd Cir. 2001) (NYSE is "immune from liability for claims arising out of the discharge of its duties under the Exchange Act.").

53.    However, Plaintiff argues that Defendant FINRA's fraudulent behavior is outside the scope of regulatory capacity that what legislators had in mind when implementing the Exchange Act and providing immunity to SROs. In fact, this very eleventh circuit court had ruled that piercing the SRO veil of absolute immunity is valid under a fraud exception of the Exchange Act in the landmark case of Weissman. *See* <u>Weissman v. NASD,</u> 468 F.3d 1306 (11th Cir. 2006). Additionally, this court had ruled that when an SRO is "performing duties that pertain to the exercise of those private franchises, powers, and privileges which belong to them for their own corporate benefit," the SRO, like a for-profit corporation, will not be entitled to immunity. *See* Id.

54.    Defendant FINRA has recently argued, in a similar case involving MMTLP,[25] that FINRA's actions were within the regulatory scope, because all it did was (a) assign the MMTLP trading symbol, (b) review and issue the Meta / NextBridge Corporate Action, and (c) halt trading of MMTLP. In its Motion to Dismiss, Defendant FINRA claims that it was not involved in anything outside of these three actions and absolves itself of all liability and blame. *See* Id.

55.    Plaintiff alleges that this is completely false. Defendant FINRA attempts to deflect the blame by stating in its FAQ,[26] that investors who did not sell by December 8 would receive NextBridge shares anyway even if it did not proceed to halt the trade. However, many investors, including Plaintiff, did not sell *precisely* because of Defendant's December 6 Corporate Action Notice that assured all shareholders that they had until December 12, and as a result, likely would not have waited until December 8 to sell. Therefore, there was misrepresentation from Defendant that led to this event.

---

[25] *See* Richard Hofman v. Fidelity Brokerage Services LLC, No. 2:23-CV-00881 (C.D. Cal. 2023).

[26]*See* FINRA FAQ, *Supra*.

56.    In addition, Defendant carelessly admits that short positions were

indeed not closed out in its own FAQ.[27] One could reasonable infer that this is

what they meant when they created an entire section dedicated to "what happens if

short positions in MMTLP were not closed out before FINRA halted trading"? In

this section, Defendant goes on to place the blame on Broker-dealers for not

closing such short positions, when in fact, FINRA ironically has the role of

providing guidance to Broker-dealers, and overseeing them. Effectively, both

Defendants have allowed short positions to be created in a private company[28],

which violates Securities law.

57.    FINRA explains its halt because it had made a determination that "an

extraordinary event has occurred or is ongoing that has had a material effect on the

market for the security or has caused or has the potential to cause major disruption

to the marketplace or significant uncertainty in the settlement and clearance

process."[29] Although it does not go into specifics about what this major disruption

is, there is direct evidence from FINRA's internal e-mails which showed that

---

[27] Id.

[28] NextBridge Hydrocarbons is an independent public-reporting private company according to its prospectus. Prospectus, *Supra*.

[29] *See* FINRA FAQ, *Supra*

Defendant was already reviewing the Blue Sheets[30] for MMTLP and MMAT on

December 5, 2022.[31] However, the other internal e-mail shows that FINRA knew

about MMTLP more than a year ago.[32] This meant that MMTLP was on FINRA's

radar, but Defendant, for some reason, did not take action to remedy the situation

for a long time. As short positions piled up from naked shorting, FINRA

recognized the magnitude of the problem but ultimately decided to halt trading on

the last two days before closure (instead of earlier), effectively shielding market

makers, hedge funds, and any other third party who were illegally or legally

shorting from having to close their positions and pay back whatever they owed. To

make matters worse, the price movement of MMTLP on December 8, 2022

dropped from $10 to $2.90 while going through significant short volume, and

significant new short positions were created just three days before short positions

were forced to be closed (or so the public assumed), which clearly implies that that

---

[30] Blue sheets are formal requests for information sent out by the SEC to market makers, broker-dealers, and/or clearinghouses. Blue sheets ask for information related to specific securities or transactions – especially those that may have affected the price of the security. Blue sheets are often requested in order to determine if there has been any illegal activity or to determine why a certain security experiences a large level of volatility.

[31] *See* Exhibit F – FINRA's Vice President of National Cause and Financial Crime Detections Programs and Head of Market Fraud's direct internal e-mail retrieved from an official FOIA request that has now been released to the public.

[32] Id.

Broker-dealers like E-Trade, hedge funds, and other third party actors were tipped

off by FINRA that a trading halt was coming.

58.    In essence, FINRA aided bad faith actors such as E-Trade and other

parties to actively short MMTLP to the ground with counterfeit shares by: (a) not

providing notice of its halt and contradicting its own Corporate Notice

announcement; and (b) by tipping off the insiders and bad faith actors that such

halt was coming; and (c) not requiring short positions to be closed in a spin-off to a

private company; and (d) suspiciously waiting over a year to address the fraudulent

activity around MMTLP until the very last two days; and (e) disregarding a

different solution to close the short positions rather than halting trade altogether

(e.g. open trading to close positions only). Just one of these items may raise

questions alone, but Plaintiff believes that the full collection of Defendant's

actions, misrepresentation, and omissions is more than substantial enough to bring

forth this claim and show the Court that Defendants had scienter, an intention to

defraud and to induce Plaintiff and other shareholders to rely on Defendant's

actions.

59.    Plaintiff believes that all these actions were outside Defendant's

regulatory duty and thus, disqualifies FINRA from its immunity.

## **MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

COMES NOW, Plaintiff JAE HYUN PARK and hereby moves this Court pursuant to Securities Exchange Act of 1934 and 65, Fed. R. Civ. P., for a preliminary injunction enjoining FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC., and officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from violations of Securities Laws and from acts of further conspiracy to commit fraud, scheme, device to defraud all retail investors of Preferred A share dividend ("MMTLP") of Metal Materials, Inc. and in support thereof state the following:

60.   Plaintiff hereby incorporates and alleges paragraphs 1-59 as if fully set forth herein.

61.   Defendants' actions have caused injustice to Plaintiff and all MMTLP retail investors. Plaintiff is requesting that FINRA return the two full trading days for MMTLP by (1) forcing all Broker-dealers who have open positions in MMTLP to participate; (2) by unpausing the halt and reverting the deletion of MMTLP ticker symbol; (3) trading with close positions only.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief and respectfully requests this Court to enter Order(s) granting:

1. Awarding Plaintiff with damages from Defendant where applicable;

2. Awarding Plaintiff for punitive damages where applicable;

3. Defendant to restore MMTLP and return two full trading days where all open positions must be closed;

4. Defendants to fully disclose all accounting related to currently open positions and exact number of shares of MMTLP;

5. Awarding Plaintiff reasonable attorney's fees and costs pursuant to O.C.G.A. § 13-6-11, and other applicable laws; and

6. Any other relief that the Court deems as just and proper.

Dated: May 2, 2023                      Respectfully Submitted,


By: _____

                                        Jae H. Park

                                        Alabama Bar No. 1904F66K

                                        *Pro Se* Plaintiff

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Northern District of Georgia Local Rule 7.1D, the

undersigned Plaintiff hereby certifies that the foregoing Complaint is a computer

document prepared in Times New Roman 14-point font in accordance with Local

Rule 5.1B.

By: Jae H. Park

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this filed this document in-person with the Clerk of the

District Court, and I hereby certify that I have mailed the aforementioned copies to

the Defendants via Certified Mail.

By: Jae H. Park

## **VERIFICATION**

Under penalty of perjury, I affirm and declare that I have read the foregoing, and confirm that the facts alleged herein to be true and correct to the best of my knowledge and belief.

By: _____

Jae H. Park

SWORN AND SUBSCRIBED before me by means of [X] physical presence or [ ] online notarization this 2nd day of May 2023 by Jae Park, who is personally known to me or has produced a driver's license as identification.

Notary Public

Print Name: J Stephen Dov

My Commission Expires: 2- 2026