IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| JAE HYUN PARK,<br><br>    Plaintiff,<br><br>    v.<br><br>FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC.,<br><br>    Defendant. | Civil Action No.<br><br>2:23-CV-69-RWS |

# **ORDER**

This case comes before the Court on Plaintiff Jae Hyun Park's ("Plaintiff") Motion for Preliminary Injunction [Dkt. 2], and Defendant Financial Industry Regulatory Authority, Inc.'s ("FINRA") Motion to Dismiss for Failure to State a Claim ("Motion to Dismiss") [Dkt. 18]. Both motions are fully briefed and ripe for this Court's consideration. After reviewing the respective briefing and the record, the Court enters the following order.

# BACKGROUND

## I. Factual Background

This case arises from actions taken by FINRA, a self-regulatory organization ("SRO") operating under the supervision of the U.S. Securities and Exchange Commission ("SEC"), to halt public trading of certain securities in advance of a planned corporate action. The securities at issue in this case are called Meta Materials Torchlight Preferred Shares ("MMTLP"). [Dkt. 6, at ¶ 1]. The MMTLP securities are associated with Meta Materials, Inc. ("Meta"), a Canadian company publicly listed in the American over-the-counter securities market. [Id.].

Plaintiff purchased MMTLP securities between November and December 2022. [Id. at ¶ 3]. On November 23, 2022, Meta announced that its board of directors had approved a corporate action to distribute 100% of the common stock of its private subsidiary, NextBridge Hydrocarbons ("NextBridge"), to MMTLP shareholders on a 1:1 ratio. [Id. at ¶ 10]. As part of that corporate action, MMTLP was to be deleted and spun out as it transitioned to NextBridge. [Id.]. Thus, all outstanding public MMTLP securities would effectively convert to private NextBridge shares once the Meta corporate action completed. [See id. at ¶ 19].

On December 6, 2022, FINRA issued a Corporate Action notice stating that MMTLP shareholders needed to settle their positions by December 12, 2022,

because MMTLP would be deleted the following day. [Id. at ¶¶ 10–11]. According to the Amended Complaint, "many investors, including Plaintiff, relied on this notice to believe that there was time to sell or trade MMTLP [securities] before the 13th of December." [Id. at ¶ 11]. Plaintiff even alleges that he purchased more MMTLP securities after FINRA issued the Corporate Action notice. [Id. at ¶ 36].

On December 9, 2022, however, FINRA announced a U3 trading halt on MMTLP securities, stating that "an extraordinary event ha[d] occurred." [Id. at ¶ 12]. The announcement did not explain what the extraordinary event was, but it stated that the trading halt would continue until the MMTLP symbol was deleted on December 13, 2022. [Id.].

The December 13 deadline came and went, but the MMTLP symbol was not deleted. [Id. at ¶ 19]. In fact, the MMTLP symbol was not deleted until February 16, 2023. [Id.]. FINRA attributed this delay to a "coding issue." [Id.]. Plaintiff, however, maintains that, although the MMTLP symbol was ultimately deleted, MMTLP securities still cannot be "truly deleted" because excessive MMTLP short positions remain open, even to this day. [Id. at ¶¶ 19–20].

According to Plaintiff, many MMTLP shareholders, including himself, held excessive short positions against MMTLP at the time FINRA halted trading of MMTLP securities. [Id. at ¶¶ 13, 20]. Plaintiff alleges that the trading halt

3

"prevent[ed] the reconciliation of those [short] positions . . . at the expense of the shareholders." [Id. at ¶ 14]. Plaintiff further alleges that, as of the date he initiated suit, neither he nor any other MMTLP shareholder had received legitimate NextBridge shares in exchange for the MMTLP shares they held when FINRA halted trading. [Id. at ¶¶ 13, 21]. Instead, Plaintiff contends that he received only a valueless CUSIP placeholder. [Id. at ¶ 13]. Thus, Plaintiff alleges that FINRA "allowed MMTLP to be shorted for [its] own benefit and profits" at the shareholders' expense. [Id. at ¶ 23].

## II.  Procedural History

Plaintiff filed his initial complaint with this Court on April 17, 2023, naming FINRA, E*TRADE Financial Corporate Services, Inc. and E*TRADE Securities, LLC (together with E*TRADE Financial Corporate Services, Inc., the "E*TRADE entities") as Defendants. [Dkt. 1]. Therein, Plaintiff asserted the following claims against all Defendants: (i) securities fraud under Section 10(b) of the Securities Exchange Act of 1934; (ii) preliminary injunction; and (iii) common law fraud. [Id. at ¶¶ 27–57]. Plaintiff also filed the instant Motion for Preliminary Injunction against FINRA contemporaneous with his initial complaint. [Dkt. 2]. Plaintiff then filed the Amended Complaint on May 2, 2023, including additional factual allegations in support of the same claims. [Dkt. 6].

On May 17, 2023, the E*TRADE entities filed a Motion to Compel Arbitration and Dismiss Action, arguing that Plaintiff was contractually bound to arbitrate his claims to the extent he asserted them against those entities. [Dkt. 7]. The Court granted that motion on July 25, 2023, and dismissed the E*TRADE entities from this action. [Dkt. 25].

FINRA filed the instant Motion to Dismiss [Dkt. 18] and responded to Plaintiff's Motion for Preliminary Injunction [Dkt. 19] on June 23, 2023. Plaintiff filed his reply in support of his Motion for Preliminary Injunction [Dkt. 26] and his response to FINRA's Motion to Dismiss [Dkt. 27] on July 28, 2023. And FINRA filed its reply in support of its Motion to Dismiss [Dkt. 28] on August 11, 2023, completing briefing for both outstanding motions. Thus, both motions are now ripe for this Court's review.

For the following reasons, the Court **GRANTS** FINRA's Motion to Dismiss and, thus, **DENIES AS MOOT** Plaintiff's Motion for Preliminary Injunction. See Gissendaner v. Comm'r, Ga. Dep't of Corr., 794 F.3d 1327, 1330 n.3 (11th Cir. 2015) ("[A] decision that the complaint fails to state a claim for relief moots any issues regarding . . . a preliminary injunction").

## DISCUSSION

I. **Legal Standard**[1]

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). While this pleading standard does not require "detailed factual allegations," "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964–65 (2007)). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 127 S. Ct. at 1974). A claim to relief is plausible on its face when the plaintiff pleads factual content necessary for the court to draw a reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences [taken] therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1

---

[1] Although Plaintiff is proceeding pro se, he is not entitled to the same leniency traditionally afforded pro se plaintiffs because he is a licensed attorney. Drees v. Ferguson, 396 F. App'x 656, 657 n.3 (11th Cir. 2010) ("[W]hen a licensed lawyer appears pro se, we do not provide her pleadings with the liberal construction customarily reserved for other pro se litigants.").

(11th Cir. 1999). But the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coco-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. Furthermore, the court does not "accept as true a legal conclusion couched as a factual allegation." Twombly, 127 S. Ct. at 1965.

## II.  Analysis

The primary issue raised by FINRA's Motion to Dismiss is whether FINRA, as an SRO, is immune from suit challenging its announcement of the Meta corporate action and its decision to halt trading of MMTLP securities following that announcement. FINRA argues that it is immune because the challenged actions constitute regulatory activities, which are protected by absolute immunity.[2] [Dkt. 18-1, at 2–3, 15 (quoting Weissman v. Nat'l Ass'n of Sec. Dealers, Inc., 500 F.3d 1293, 1296 (11th Cir. 2007))]. The Court agrees.

---

[2] FINRA further argues that, even if the challenged actions are not protected by absolute immunity, the Amended Complaint nonetheless fails to state a claim because (i) the allegations set forth therein are conclusory in nature and thus fail to satisfy the heightened pleading standard governing Plaintiff's fraud claims, and (ii) no statute provides a private right of action against SROs for "acts or omissions in connection with its duties as a securities regulator." [Dkt. 18-1, at 3]. As discussed below, the Court finds FINRA's absolute immunity argument dispositive. Therefore, the Court need not consider FINRA's remaining arguments.

Through the Securities Exchange Act of 1934, "Congress established a system of regulation over the securities industry, which relies on private [SROs] to conduct the day-to-day regulation and administration of the United States' stock markets, under the close supervision of the [SEC]." Weissman, 500 F.3d at 1296–97. FINRA, previously known as the National Association of Securities Dealers, is one of those SROs. Turbeville v. Fin. Indus. Regulatory Auth., Inc., 874 F.3d 1268, 1270 (11th Cir. 2017).

As an SRO, FINRA is "charged with the duty and responsibility of monitoring [the securities] market carefully to protect the investing public." Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc., 159 F.3d 1209, 1215 (9th Cir. 1998), overruled in part on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning, 136 S. Ct. 1562 (2016). That charge requires FINRA to establish rules (i) preventing fraudulent and manipulative acts and practices, (ii) promoting just and equitable principles of trade, (iii) fostering cooperation among securities regulators, (iv) ensuring the market operates freely and openly, and (v) protecting investors and the public interest. 15 U.S.C. § 78o-3(b)(6); Empire Fin. Grp., Inc. v. Fin. Indus. Regulatory Auth., Inc., 2009 WL 10644856, at *6 (S.D. Fla. Jan. 15, 2009). FINRA is also vested with the authority to take actions—such as suspending trading of securities under certain circumstances—to

ensure those rules are carried out properly. See Sparta, 159 F.3d at 1214–15; Empire, 2009 WL 10644856, at *6 (citing 15 U.S.C. § 78o-3(b)(7)).

SROs like FINRA "are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions." Weissman, 500 F.3d at 1296. But absolute immunity ceases to obtain when SROs perform non-governmental functions or acts in furtherance of their own private interests (i.e., acts that fall outside the scope of their regulatory authority). Id. at 1296–97. Stated plainly, "[a]bsolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function." Id. at 1297.

In determining whether an SRO's challenged conduct qualifies as a quasi-governmental function, courts "look to the objective nature and function of the activity for which the SRO seeks to claim immunity." Id. And while "there may be some correlation between motive and intent and the function being performed," an SRO's subjective motivation does not transform an otherwise quasi-governmental action into a non-governmental action. Id; see also Gallagher v. Fin. Indus. Regulatory Auth., Inc., 2022 WL 1815594, at *2 (11th Cir. June 3, 2022) (quoting Weissman, 500 F.3d at 1298). Rather, courts consider only the "function being performed" by the SRO. Gallagher, 2022 WL 1815594, at *2.

"We begin our analysis by 'examin[ing] the nature and function of [FINRA's] actions as alleged' in the complaint." Id. (quoting Weissman, 500 F.3d at 1298). Here, the Amended Complaint challenges two primary actions taken by FINRA: (i) the publication of the Corporate Action notice; and (ii) the decision to halt trading of MMTLP securities before December 12, 2022. [Dkt. 6, at ¶¶ 32–36, 55–58 (alleging FINRA's Corporate Action notice falsely represented that MMTLP shareholders had until December 12, 2022, to settle their positions); id. at ¶¶ 21–23, 33–34, 53–54 (alleging FINRA's decision to halt trading of MMTLP securities fell outside the scope of its regulatory authority)]. The Court finds that these actions are regulatory in nature and thus protected by absolute immunity.

FINRA relies on two cases in their Motion to Dismiss that are directly on point: Tawil v. Fin. Indus. Regulatory Auth., Inc., 2023 WL 4353179 (N.D. Fla. May 24, 2023) and Hofman v. Fidelity Brokerage Servs., LLC, 2023 WL 3872564 (C.D. Cal. May 8, 2023), appeal docketed, No. 22-55494 (9th Cir. June 6, 2023). [Dkt. 18-1]. Both cases arose from the Meta corporate action—the same factual circumstance at issue here. Both plaintiffs challenged the legitimacy of FINRA's Corporate Action notice announcing the Meta corporate action and FINRA's subsequent decision to halt trading of MMTLP securities—the same conduct Plaintiff challenges here. And both cases found that challenged conduct to be

quasi-governmental and regulatory in nature, and thus entitled to absolute immunity. Those decisions compel the same result here.

In Tawil, the investor plaintiff alleged FINRA prematurely halted trading of MMTLP securities, which in turn reduced the value that she and other shareholders received when their shares were exchanged pursuant to the Meta corporate action. Tawil, 2023 WL 4353179, at *1. The district court found, however, that FINRA's decision to halt trading was "precisely the kind of activity FINRA can undertake in its quasi-regulatory capacity." Id. As such, the court found FINRA entitled to absolute immunity:

> A claim that FINRA got it wrong—that trading should not have been suspended—is precisely the kind of claim from which FINRA should and does have immunity. Review of FINRA's decisions is available in appropriate circumstances in the [SEC] and through judicial review of [SEC] actions.

Id. (citing Empire, 2009 WL 10644586, at *6).

Hofman is perhaps even more directly on point. The plaintiff there alleged "FINRA wrongfully halted trading of [MMTLP] securities in December 2022, which facilitated [FINRA's] fraudulent scheme involving short sales by nonparties and restrained Plaintiff from selling his securities for an anticipated profit before a corporate action that ultimately left him with a 'valueless security.'" Hofman, 2023 WL 3872564, at *2. But again, the district court found that "[a]bsolute immunity

11

extend[ed] to all of FINRA's complained-of actions. Facilitating trading of [MMTLP] securities and publishing corporate action notices are functions within the ambit of FINRA's regulation and oversight of the over-the-counter market." Id. at *6. The Court finds these cases instructive.

Still, Plaintiff argues both Tawil and Hofman are distinguishable despite these overwhelming similarities. First, Plaintiff submits Tawil is distinct because "the case was ultimately dismissed without prejudice on arguments that were different" from those Plaintiff raises here. [Dkt. 27, at 7]. But a thorough review of that decision reveals that the Tawil court did in fact consider the same immunity argument Plaintiff asserts now: that FINRA's decision to suspend trading of MMTLP securities did not constitute a quasi-governmental action entitled to absolute immunity. Tawil, 2023 WL 4353179, at *1. And, as discussed above, the Tawil court found that decision to be "precisely the kind of activity FINRA can undertake in its quasi-regulatory capacity" and, thus, it was protected by absolute immunity. Id. Therefore, Plaintiff's cursory attempt to distinguish Tawil fails.

Next, Plaintiff contends Hofman is not instructive because that court "admitted some ambiguity while ruling for nonmonetary immunity, which is precisely what Plaintiff is requesting from FINRA—i.e., [a] nonmonetary preliminary injunction." [Id.]. While true, Plaintiff's argument omits the most

12

pertinent part of the story: the Hofman court went on to observe that "several district courts have extended absolute immunity to claims for declaratory and injunctive relief" and adopted the reasoning of those courts. Hofman, 2023 WL 3872564, at *8 (citing Cashmore v. Fin. Indus. Regulatory Auth., Inc., 2020 WL 6566302 (W.D.N.Y. Nov. 9, 2020). Moreover, Plaintiff ignores that courts within the Eleventh Circuit "have held FINRA immune from claims for injunctive relief." Tawil, 2023 WL 4353179, at *1 (collecting cases). Therefore, Plaintiff's attempt to distinguish Hofman on the basis that absolute immunity does not extend to claims for equitable relief also fails.

Likewise, Plaintiff's attempts at finding a case more analogous to the instant action than Tawil or Hofman fail. First, Plaintiff tries to analogize this case to Weissman, where the Eleventh Circuit held FINRA's predecessor, the National Association of Securities Dealers,[3] and its subsidiary, the NASDAQ stock market, were not immune from an investor's fraud claims arising from an advertising campaign promoting stock trades. [Dkt. 27, at 8–9]. That argument fails because advertising and marketing actions, unlike the actions Plaintiff challenges here, fall outside the scope of FINRA's regulatory duties.

---

[3] See Tawil, 2023 WL 4353179, at *1 (acknowledging that the National Association of Security Dealers is FINRA's predecessor).

Weissman arose following the WorldCom collapse. The plaintiff there alleged he was induced into purchasing WorldCom stock in the company because of misleading advertisements published by NASDAQ. According to the plaintiff, the advertisements did not disclose that NASDAQ's own revenues were directly enhanced by increased trading activity in WorldCom. Weissman, 500 F.3d at 1299 (noting that plaintiff alleged NASDAQ "touted, marketed, advertised and promoted WorldCom, falsely representing it as a good company and worthwhile investment" without revealing accurate financial statements). The Weissman court held that the advertisements were "in no sense coterminous with the regulatory activity contemplated by the Exchange Act," and instead constituted a private business activity that fell outside the scope of SRO immunity. Id. ("NASDAQ represents no one but itself when it entices investors to trade on its exchange, and, specifically, when it suggests that particular companies are sound investments."). The same cannot be said here. The actions Plaintiff challenges through the Amended Complaint—publishing information regarding the Meta corporate action and subsequently suspending trading in light of that corporate action—fall squarely within FINRA's regulatory activity. See Tawil, 2023 WL 4353179, at *1; Hofman, 2023 WL 3872564, at *6.

Plaintiff next claims the instant case is more similar to Opulent Fund but fails to articulate how. [Dkt. 27, at 10]. Instead, Plaintiff states in conclusory fashion that FINRA "may have seemed like it was performing regulatory activities, but [it] was truly not." [Id.]. But Opulent Fund, like Weissman, is distinguishable because that case involved NASDAQ's facilitation of derivative trading, another non-regulatory action. See Opulent Fund, L.P. v. Nasdaq Stock Mkt., Inc., 2007 WL 3010573, at *5 (N.D. Cal. Oct. 12, 2007) (finding NASDAQ's pricing index—setting the price for trades—did not constitute a "regulatory function" and thus was not entitled to absolute immunity). In fact, Plaintiff's reliance on Opulent Fund cuts against him because that case acknowledged that the very actions Plaintiff challenges here—e.g., suspending trading—qualify for SRO immunity: "Nasdaq's actions do not partake in the same 'regulatory' character as suspending trading, banning traders, or carrying out disciplinary actions. These actions all involve oversight of the market to protect investors; facilitating derivative trading does not."[4] Id. Therefore, the Court finds both Weissman and Opulent Fund distinguishable.

---

[4] Indeed, Plaintiff even concedes—while attempting to analogize the instant action to Opulent Fund—that FINRA "regularly suspends or halts trades" when performing its regulatory duties. [Dkt. 27, at 10].

15

At bottom, the Amended Complaint does not allege that FINRA lacked the regulatory authority to take the actions it took; the Amended Complaint alleges only that Plaintiff disagrees with FINRA's decision to take those regulatory actions, which is insufficient to defeat SRO immunity. Specifically, Plaintiff disagrees with FINRA's decision to halt trading of MMTLP securities in advance of the initially announced trading deadline. But as the above cases (and many others) and FINRA's own rules make abundantly clear, "[s]uspending trading—when warranted—is precisely the kind of activity FINRA can undertake in its quasi-regulatory capacity." Tawil, 2023 WL 4353179, at *1; Sparta, 159 F.3d at 1214 ("[T]here are few functions more quintessentially regulatory than suspension of trading."); In re Facebook, Inc. IPO & Sec. & Derivative Litig., 986 F. Supp. 2d 428, 454 (S.D.N.Y. 2013) ("The capacity to suspend trading, irrespective of the identity of the decision-maker or the presence of an official SEC rule, is quintessentially a regulatory function."); see also FINRA R. 6440 (permitting FINRA to suspend trading when it determines that an "extraordinary event has occurred" that "has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process").[5]

---

[5] FINRA asks the Court to take judicial notice of the official rules posted on its website. [Dkt. 18-1, at 7 n.4]. Plaintiff does not oppose that request. As such, the Court grants the unopposed request to take judicial notice of FINRA's rules

16

So too is the ability to publish or announce corporate actions and associated decisions stemming from those corporate actions. See DL Cap. Grp., LLC v. Nasdaq Stock Mkt. Inc., 409 F.3d 93, 98 (2d Cir. 2005) ("[A]nnouncing the suspension or cancellation of trades is as much a part of [FINRA's] regulatory duties as is the actual suspension or cancellation of trades." (quotation omitted)); see also FINRA R. 6490 (requiring FINRA to process and publish certain information to the investing public regarding corporate actions related to over-the-counter equity securities). If it were not, FINRA "would be stripped of a critical and necessary part of their regulatory powers—namely, the power to inform the public of those actions it has undertaken in the interest of maintaining a fair and orderly public or protecting investors and public interest." DL Cap., 409 F.3d at 98 (cleaned up) (quotation omitted). Moreover, "reporting its regulatory actions to the public is, at the very least, certainly consistent with [FINRA's] quasi-governmental powers as an SRO, given that safeguarding the integrity of market information was one of the purposes behind the regulation of the securities markets in the first place." Id. (cleaned up) (quotation omitted). Therefore, the Court finds that the

---

(specifically rules 6440 and 6490). See In re Jan. 2021 Short Squeeze Trading Litig., 584 F. Supp. 3d 1161, 1170 n.4 (S.D. Fla. 2022) (taking judicial notice of FINRA regulations under FED. R. EVID. 201); Hofman, 2023 WL 3872564, at * n.7 (first citing FED. R. EVID. 201(b); and then citing Prodanova v. H.C. Wainwright & Co., 2018 WL 8017791, at *4 (C.D. Cal. Dec. 11, 2018)).

gravamen of the Amended Complaint challenges actions that "arise out of, and directly relate to, [FINRA's] performance of a regulatory duty, for which it enjoys quasi-governmental immunity." Gallagher, 2022 WL 1815594, at *3 (citing Weissman, 500 F.3d at 1296–97).

In a final effort to defeat dismissal, Plaintiff contends that FINRA's actions are not entitled to absolute immunity because the challenged actions involve fraudulent behavior. [Dkt. 27, at 3–4, 11 (arguing that, even if FIRNA's acts are deemed to be regulatory functions, "Defendant's intentional misconduct . . . should pierce the veil of SRO immunity")]. Effectively, Plaintiff advocates for the Court to adopt a "fraud exception" to the SRO immunity doctrine. [See Dkt. 6, at ¶ 53 (alleging the Eleventh Circuit recognized a fraud exception to SRO immunity in Weissman)]. But contrary to Plaintiff's contentions,[6] no such exception exists. See, e.g., DL Cap., 409 F.3d at 98 (rejecting a fraud exception to SRO immunity). Therefore, FINRA's Motion to Dismiss is due to be granted and the Amended Complaint is due to be dismissed.

---

[6] The Court does not read Weissman to create or even recognize any such exception (and it appears that no other court has interpreted Weissman to do so either). Instead, Weissman simply held that advertising campaigns promoting certain stocks did not constitute quasi-governmental functions entitled to absolute immunity. See Weissman, 500 F.3d at 1299.

## CONCLUSION

For the foregoing reasons, FINRA's Motion to Dismiss [Dkt. 18] is **GRANTED**. And because the Court finds that there is no set of facts Plaintiff may plead or prove to show that the challenged FINRA actions fall outside the scope of their regulatory functions, the Amended Complaint [Dkt. 6] is **DISMISSED WITH PREJUDICE**. See Hofman, 2023 WL 3872564, at *9. As a result, Plaintiff's Motion for Preliminary Injunction [Dkt. 2] is **DENIED AS MOOT**.

The Clerk is **DIRECTED** to close the case.

**SO ORDERED** this 25th day of September, 2023.

_____
**RICHARD W. STORY**
United States District Judge